

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

DOMINGO RIVERA, JR.,                    §
                                        §
          Plaintiff,                    §
                                        §
v.                                      §     CIVIL ACTION NO.
                                        §     5:05-CV-025-C
                                        §
JO ANNE B. BARNHART,                    §
Commissioner of Social Security,        §
                                        §
          Defendant.                    §

**U.S. DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FILED**

**OCT 2 7 2005**

**CLERK, U.S. DISTRICT COURT**
By _____
          Deputy

## REPORT AND RECOMMENDATION

Plaintiff Domingo Rivera, Jr., seeks judicial review of a decision of the Commissioner of Social Security denying his application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. The United States District Judge, pursuant to 28 U.S.C. § 636(b), referred this case to the United States Magistrate Judge for report and recommendation, proposed findings of fact and conclusions of law, and a proposed judgment. After reviewing the administrative record and the arguments of both parties, this court recommends that the District Court reverse and remand the Commissioner's decision.

## I.   Facts

### A.   *Medical History*

Rivera alleged disability at the age of thirty-six due to Systemic Lupus Erythematosus (SLE or lupus), a pancreatic tumor, and hypertension. (Tr. 15, 67, 76, 84, 106.) Rivera's health problems surfaced in late winter/early spring of 1999 when he was hospitalized and

diagnosed with nephrotic syndrome secondary to lupus nephritis[1] and uncontrolled hypertension. (Tr. 76, 136-37, 152, 157, 163.) Rivera had stopped working on February 25, 1999, and on April 19, 1999, Rivera's primary physician, Janet Cruz, M.D., recommended that he remain off work for an additional four weeks. (Tr. 153-54.) At that time Rivera complained of frequent muscle cramps; his hypertension was uncontrolled and treated with Zestril; and his nephrotic syndrome and lupus nephritis were treated with steroid therapy of 40 milligrams of prednisone twice daily. (*Id.*; *see* Tr. 151.)

Approximately one month later Dr. Cruz noted that Rivera's hypertension was controlled and that his renal functioning was stable; she recommended continued treatment of his hypertension with Zestril and tapered his dosage of prednisone from forty mg twice daily to thirty mg twice daily. (Tr. 151.) Dr. Cruz also noted that Rivera continued to complain of muscle cramps but noted that his electrolytes were within acceptable limits; she advised him to take quinine tablets as needed for the muscle cramps. (Tr. 151.) Because Rivera's blood pressure had improved, Dr. Cruz released him to return to work the following week. (Tr. 152.)

Dr. Cruz examined Rivera one month later. She continued Rivera on prednisone, noted that his hypertension was "fairly controlled" and that he continued to complain of muscle cramps in his hands and legs and had not resumed work because of the muscle

---

[1]

This condition affects the kidneys and occurs in individuals with lupus. It is characterized by the presence of red blood cells in the urine. Patients with a progressive course of nephritis experience kidney failure. STEDMAN'S MEDICAL DICTIONARY 1190 (27th ed. 2000).

2

cramps. (Tr. 149-50.) She advised Rivera that he could increase his dosages of quinine up to three times daily as necessary and that he could "make his own decision with regard to his work status"as she had already released him to return to work. (Tr. 150.)

On September 14, 1999, six months after DeLeon began steroid therapy, Dr. Cruz noted that Rivera reported feeling well without major complaints, that his hypertension was controlled, and that she was pleased with his overall clinical improvement in regard to his lupus nephritis. (Tr. 145-46.) At that time Dr. Cruz had decreased Rivera's dosage of prednisone to 20 mg twice daily. (*Id*.)

Despite Dr. Cruz advising Rivera that he could resume work, Rivera did not return to work. He testified that he did not go back to work because his former employer would not allow him to return to work and because other employers would not hire him. (Tr. 548.)

By January 2000 Rivera had experienced an improvement in his lupus nephritis without complete resolution and Dr. Cruz considered further decreasing his dosage of prednisone. (Tr. 143-44.)

On July 19, 2000, Rivera was admitted to Covenant Hospital Plainview with complaints of persistent abdominal pain. (*See* Tr. 279.) He was diagnosed with acute pancreatitis and experienced some improvement with treatment. (*Id*.; Tr. 284.) After he was released, however, he experienced a recurrence and was readmitted on August 3, 2000. (Tr. 284.) Because of his symptoms, Rivera was transferred to Covenant Hospital in Lubbock, Texas, on August 21, 2000. (Tr. 279.) Physicians there discovered a pancreatic

3

pseudocyst in Rivera's pancreas and treated his symptoms without surgery. (Tr. 279, 403.)

On July 23, 2001, Rivera was admitted once again to Covenant Hospital Plainview for pancreatic problems. (Tr. 217-20.) He reported that he had been doing well until that time but that he began experiencing sharp abdominal pains, nausea, and vomiting one day prior to admission to the hospital. (*Id.*) Physicians diagnosed acute pancreatitis with unknown cause. (Tr. 219.) It was thought that Rivera's condition was caused by either his lupus, his medications, a "massive destruction," or a recurrent pancreatic cyst. (Tr. 219.) Rivera was again transferred to Covenant Hospital in Lubbock, Texas, and on August 3, 2001, a Computerized Tomography Scan (CT-Scan) revealed acute pancreatitis with an acute hematoma in his liver in addition to a pseudocyst that measured 2.5 cm. (Tr. 177.) One week later a CT-scan showed that Rivera suffered from evolving pancreatitis and that the pseudocyst had increased in size to seven cm. (*Id.*) Rivera's physicians discharged him from the hospital on August 15, 2001, with medications and a recommendation for a follow-up examination and CT-Scan in three weeks. (Tr. 178.)

In November 2001 Rivera reported that he continued to experience severe nausea, vomiting, and abdominal pain, and a CT-Scan on December 5, 2001, showed that the hematoma remained but was slightly decreased in size and that several small cysts were present in his liver. (Tr. 322, 330.) On January 2, 2002, however, a physician indicated that the hematoma in his pancreatitis was resolving. (Tr. 329.)

4

During 2001 and 2002 Rivera reported symptoms that were attributed to his long-term treatment with prednisone.[2]  (Tr. 352, 395.)  He reported blurred vision in February 2002 and it was thereafter discovered that steroid-induced cataracts had developed in his eyes. (Tr. 252-53, 284.)  He underwent surgical removal of a cataract in his right eye on May 16, 2002.  (Tr. 252-53, 284.)

On March 18, 2002, Marta Aleman, M.D., noted that Rivera had suffered with back and left hip pain for one year and had begun complaining of left leg numbness.  (Tr. 359.) Rivera continued to complain of hip pain and chronic joint pain and on August 16, 2002, Dr. Aleman discussed with Rivera the option of consulting with an orthopedic specialist. (Tr. 511.)  Thereafter, Jack Henry, M.D., an orthopedic surgeon, discovered Avascular Necrosis (AVN) in Rivera's right and left hips.[3]  Tests showed that the AVN was worse in the left hip than in the right hip, and on October 7, 2002, Dr. Henry performed a bone decompression and bone graft on the left hip.  (Tr. 431, 449.)

B.    *Testimony at the Hearing*

Rivera testified at a hearing before an Administrative Law Judge (ALJ) on October 21, 2002, two weeks after he underwent hip surgery.  (Tr. 541.)  He testified in part

---

[2]

Prolonged steroid treatment with pharmaceutical drugs such as prednisone may cause a number of adverse effects in patients including cataracts, hypertension, osteoporosis, and necrosis of the hip bones. PHYSICIAN'S DESK REFERENCE 3065 (56th ed. 2002).

[3]

AVN is a disease resulting from blood loss to the bones.  *See* HealthLink, Medical College of Wisconsin, www.healthlink.mcw.edu/article/926046182.html (last visited October 18, 2005).  Without blood, bone tissue dies and the condition in  bones near joints often causes joint collapse.  The condition is sometimes resolved with the rebuilding of bone.  However, when the bone does not rebuild, collapse may occur as well as severe pain, disabling osteoarthritis, and limitation in range of motion.  *Id.*  Three of the most common causes of AVN are injury, excessive alcohol use, and treatment with steroid medications such as prednisone.  *Id.*

that he spent most of his day sitting or lying on his side and complained that he experienced pain and numbness in his lower back. (Tr. 551-52.) He testified that he had undergone a decompression in his left hip and that if the decompression was not successful in resolving the AVN in his hip, physicians planned to provide him with a total hip replacement. (Tr. 554, 558.) He also testified that his physicians planned to perform a decompression on his right hip. (Tr. 558.)

Rivera also testified that he suffered from swelling in his abdomen and from nausea and vomiting which he attributed to his pancreatic conditions. (Tr. 559.) He claimed that he often vomited in the mornings and that his symptoms were unpredictable with some days being worse than others. (*Id.*)

Hellmut Tauber, M.D., also testified at the hearing. (Tr. 542, 559; *see* Tr. 60-61.) Dr. Tauber testified in part that Rivera's impairments did not meet or medically equal a listed impairment in the Commissioner's regulations. (Tr. 560-61.) He indicated that tests in 1999 showed that Rivera's lupus nephritis improved with treatment; an Anti-Nuclear AntiBody (ANA) test was positive, which would indicate the presence of SLE, but at that time it was not severe. (Tr. 560.) His Blood Urea Nitrogen (BUN) was within normal limits, his kidney functions were within normal limits, and his liver functions were normal. (*Id.*; *see* Tr. 15.) Based on those clinical findings, Dr. Tauber believed that Rivera could have performed light work with no restrictions in 1999. (Tr. 560.) Dr. Tauber described Rivera's pancreatic pseudocyst as "a coincidental finding" and testified that he believed that his liver hematoma should not have caused "much problem." (*Id.*)

6

Dr. Tauber explained that prolonged use of steroids can cause changes in an individual's bones. He also indicated that years of steroid therapy had caused Rivera to develop a cataract and a "kind of moon face." (Tr. 560.)

Dr. Tauber ended his testimony by stating, "Even today, I believe he certainly could perform light work, probably – now, I learned today about his hip problems, probably with a sit and stand option. I have no idea how severe his hip problem is." (*Id.*)

A vocational expert also testified as to the jobs Rivera could perform based on a hypothetical question from the ALJ and questions from Rivera's representative. (Tr. 563-65.)

C.    *The ALJ's Decision*

The ALJ issued a decision on December 17, 2002, in which he found Rivera not disabled and not entitled to Social Security benefits. (Tr. 14-20.) The ALJ acknowledged that Rivera had severe impairments but determined that his impairments did not meet or medically equal a listed impairment. (Tr. 16.) The ALJ noted that he "relied heavily" on Dr. Tauber's testimony in evaluating Rivera's functional capacities and determined that despite his severe impairments, Rivera retained the Residual Functional Capacity (RFC) to perform the full range of light work from the date on which Rivera alleged he became disabled until the end of 2001. (Tr. 17.) He concluded that based on Rivera's RFC and other vocational factors, the Medical-Vocational Guidelines directed a finding that he was not disabled between February 25, 1999, and December 31, 2001. (Tr. 20.) He then found

7

that Rivera's problems with his hips were progressive and gradual and that beginning on January 1, 2002, his ability to perform light work was limited by occasional climbing, balancing, stooping, crouching, kneeling, crawling, squatting, a less than moderate concentration deficit, and the option to sit/stand while in the performance of job duties. (Tr. 18.) Based on Rivera's RFC after January 1, 2002, and using the Medical-Vocational Guidelines as a framework, the ALJ determined that there were a significant number of jobs that Rivera could perform in the national economy and that he was therefore not disabled. (Tr. 20.)

      D.    *Rivera's Contentions*

Rivera contends that the Appeals Council failed to adequately consider additional medical evidence he submitted after the hearing; that the ALJ erred in not finding that his impairments met or medically equaled Listing 4.02(B) in the Commissioner's regulations; and that the ALJ erred in failing to incorporate nausea and other non-exertional impairments in the hypothetical questions posed to the vocational expert.

## II.    Discussion

The substantial evidence standard requires the court to consider the entire record, including additional evidence that was before the Appeals Council and that supports the claimant's position. *See Smith v. Schweiker*, 646 F.2d 1075, 1082 (5th Cir. 1981). Thus, the court must consider additional evidence not before the ALJ but submitted to the Appeals Council in determining whether substantial evidence supports the Commissioner's final

decision. *See Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005). The court may

remand a plaintiff's case for further consideration of evidence "not explicitly weighed and

considered by the [Commissioner] when such consideration was necessary to a just

determination of the plaintiff's application." *Smith*, 646 F.2d at 1082 (citing *Williams v.

Califano*, 590 F.2d 1332, 1334 (5th Cir. 1979)).

In this case, consideration of the additional evidence submitted to the Appeals Council

in regard to Rivera's AVN must be explicitly weighed and considered by the Commissioner,

which is evidence critical to a just determination in this case because it demonstrates that the

decompression and bone graft Rivera underwent in October 2002 was unsuccessful.

(*See* Tr. 451, 446, 449.) In addition, the additional evidence includes medical information

regarding the severity of Rivera's AVN not considered by the testifying medical expert upon

whose opinion the ALJ relied.[4]

The ALJ stated that he "relied heavily" upon Dr. Tauber's testimony in evaluating

Rivera's functional capacities. (Tr. 16.) Dr. Tauber testified, however, that he had learned

only on the day of the hearing about Rivera's hip problems and that he "had no idea how

severe [Rivera's] hip problem [was]."[5] (Tr. 560.)

---

[4]

Dr. Tauber did not have the records regarding Rivera's hip problems before him. The ALJ admitted Exhibits 1 through 14F into the administrative record at the hearing and those exhibits did not contain evidence regarding the condition of Rivera's hip. (Tr. 3, 543.) Dr. Henry's records are contained in Exhibit 15F (Tr. 429-45) and in the additional evidence Rivera submitted to the Appeals Council (Tr. 4A, 449-67).

[5]

Dr. Tauber, in fact, did not understand the severity of Rivera's post-surgical condition. Although Rivera testified that he had undergone a decompression on his hip (Tr. 558), he did not testify that he had also undergone a bone graft. A

The additional evidence demonstrates the severity of Rivera's hip problem. The decompression and bone graft did not eradicate Rivera's AVN; his pre-operative as well as post-operative diagnosis was bilateral AVN. (Tr. 431.) In February 2003, four months after surgery, Rivera still could not walk without crutches and Dr. Henry speculated that a total hip replacement might be necessary. (Tr. 454, 477.) In April 2003 Dr. Henry advised Rivera that he would probably need a total hip replacement. (Tr. 451.) At that time Rivera had significant pain and was unable to bear weight on his left hip. (*Id.*) On May 15, 2003, Dr. Henry indicated that Rivera continued to have trouble and pain in his left hip and that he did not think that he could work a full forty-hour work week. (Tr. 449.) Dr. Henry indicated that he had "been holding off doing a total hip [replacement] as long as [he could] . . .." (*Id.*) By September 2003, Rivera's left hip had "continued to go on to collapse" and the AVN in his right hip had progressed to a point that required a decompression. (Tr. 446.)

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The medical evidence submitted to the Appeals Council suggests that the impairments caused by Rivera's AVN may have been expected to last a period of twelve months from the date on which he

---

bone graft for AVN is described as "complex" with a lengthy recovery lasting from six to twelve months. National Institutes of Health, National Institute of Arthritis and Musculoskeletal and Skin Diseases, www.nih.gov/hi/topics/avascular-necrosis/#link-e (last visited October 18, 2005).

underwent the decompression and bone graft on his left hip on October 7, 2002. However, Dr. Tauber did not know the severity of Rivera's AVN and therefore his testimony, on which the ALJ relied in determining Rivera's RFC, does not provide substantial evidence that Rivera was capable of restricted light work and therefore not disabled. The new evidence Rivera submitted to the Appeals Council is material because it might have changed the ALJ's analysis or decision. *See Higginbotham*, 405 F.3d at 334; *Smith*, 646 F.2d at 1082; *Epps v. Harris*, 624 F.2d 1267,1273 (5th Cir. 1980). Given the materiality of the new evidence, on remand the Appeals Council should adequately consider the evidence rather than "perfunctorily adher[ing]" to the ALJ's decision. *See Epps*, 624 F.2d at 1273.

Rivera's contention that the ALJ erred in not finding that his impairments met or medically equaled Listing 4.02(B) for lupus has no merit; substantial evidence supports the ALJ's determination that Rivera's impairments did not meet or medically equal Listing 14.02 or any other listing in the Commissioner's regulations. However, because remand should issue for the consideration of the evidence related to Rivera's AVN, on remand the Commissioner should further consider Rivera's complaints of nausea and vomiting and the extent they should be credited and, if credited, consult a vocational expert in regard to the effect that those impairments might have on the occupational base.

## III.   **Recommendation**

Based on the foregoing discussion of the issues, evidence and the law, this court recommends that the United States District Court reverse the Commissioner's decision and remand Rivera's case for further administrative proceedings.

IV.   **Right to Object**

Pursuant to 28 U.S.C. § 636(b)(1), any party has the right to serve and file written objections to the Report and Recommendation within 10 days after being served with a copy of this document. The filing of objections is necessary to obtain de novo review by the United States District Court.  A party's failure to file written objections within 10 days shall bar such a party, except upon grounds of plain error, from attacking on appeal the factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).

Dated: _____October 27_____, 2005.

NANCY M. KOENIG
United States Magistrate Judge

12